UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

|  |  |  |
|---|---|---|
| TIGER CENTER FOR APPLIED BEHAVIOR ANALYSIS SERVICES, LLC and JEFFREY TIGER | ) ) ) ) ) | |
| Plaintiffs, | ) | Case No.: 2:23CV01540 |
| v. | ) | |
| | ) | Honorable Pamela Pepper |
| MARQUETTE UNIVERSITY and HEIDI BOSTIC, | ) ) | Magistrate Judge Duffin |
| Defendants. | ) ) | |

**AMENDED COMPLAINT**

NOW COMES the Plaintiffs, TIGER CENTER FOR APPLIED BEHAVIOR ANALYSIS SERVICES, LLC and JEFFREY TIGER, through their counsel, The Rose Group S.C., and as for their Complaint against the above-named Defendants, MARQUETTE UNIVERSTY and HEIDI BOSTIC, hereby alleges and shows to the Court as follows:

## PARTIES

1.     Plaintiff, TIGER CENTER FOR APPLIED BEHAVIOR ANALYSIS SERVICES, LLC ("The Tiger Center"), is a Wisconsin limited liability company that was formerly located at 525 N. 6th Street, Milwaukee, WI 53203.

2.     Plaintiff, JEFFREY TIGER, PHD. ("Dr. Tiger"), is a Wisconsin resident with a residential address located at 10610 N. Wood Crest Ct., Mequon, Wisconsin 53092.

3.     Defendant, MARQUETTE UNIVERSITY ("Marquette"), is a non-stock corporation that operates as an educational institution with a principal place of business located at 1250 W. Wisconsin Avenue, Milwaukee, WI. The registered agent is Jeffrey M. Kipfmueller located at Zilber Hall, 1250 W. Wisconsin Avenue, Suite 212, Milwaukee, WI 53233.

1

4.      Defendant, HEIDI BOSTIC (" Dean Bostic"), is a Wisconsin resident with an unknown address, but with an office location at Sensenbrenner Hall, Suite 103, 1103 W. Wisconsin Avenue, Milwaukee, WI 53233.

## FACTUAL BACKGROUND

5.      The Wisconsin Legislature passed its autism insurance bill, 632.895(12m) Wis. Stat Act 28 Section 609.87, establishing funding for the provision of Applied Behavior Analysis services in the state of Wisconsin in 2009 as well as licensure for Applied Behavior Analysis.

6.      At the time, there were no training programs in applied behavior analysis in Wisconsin and few providers in the state.

7.      The University of Wisconsin-Milwaukee ("UWM") hired Dr. Tiger as an assistant professor in 2011 to design the first of its kind training program in behavior analysis in the department of psychology.

8.      Training in behavior analysis is dictated by the Behavior Analysis Certification Board, which requires Masters and Doctoral students to receive both classroom instruction and intensive, supervised practicum experiences under the guidance of credentialed, Board-Certified Behavior Analysts prior to sitting for a certification examination.

9.       There were few credentialed Behavior Analysts in the state of Wisconsin, and none that offered training specific to individuals who engage in chronic and severe forms of problem behavior such as aggression, self-injury, and property destruction.

10.     Dr. Tiger received training in behavioral assessment and treatment for individuals with severe challenging behavior as a postdoctoral fellow at the University of Nebraska Medical Center and continued working with this population throughout his professional career.

11.      To provide the training experiences to students required by the Behavior Analysis

Certification Board that were not available elsewhere, Dr. Tiger formed the Tiger Center for Applied Behavior Analysis Services in 2011.

12.     The Tiger Center hired a variety of individuals, including individuals seeking practicum training to work as therapists for children with severe behavioral challenges and provided these trainees with the supervision needed to complete practicum training requirements. This ensured that trainees received a high-quality experience as well as fair-market compensation for their labor, as opposed to uncompensated internships that were otherwise available to students.

13.     The partnership between The Tiger Center and UWM was beneficial to both parties. Enrollment in UWM's Behavior Analysis Program grew steadily Between 2011 and 2017 under the direction of Dr. Tiger with national recognition for the success of their training model.

14.     Between 2011 and 2017, the Tiger Center was a successful and profitable business which had steady and consistent growth.

15.     Between 2011 and 2013, Dr. Douglas Woods ("Dr. Woods") worked as a faculty member in the Psychology Department at UWM and served both as chair of the psychology department and the dean of the graduate school. He left his position at UWM before joining the administration at Marquette in January 2016.

16.     In the Summer of 2016, Dr. Tiger was approached by Dr. Woods about joining Marquette's faculty to launch a new training program in Behavior Analysis with a model similar to that built at UWM. This specifically involved creating a dedicated on-campus location to house the clinical and practicum training experiences that could be offered to Marquette students via the Tiger Center.

17.     Beginning in December of 2016, Dr. Tiger, individually and as managing member of The Tiger Center, entered into negotiations with Marquette about the proposal that had been

3

made.

18.     On February 20, 2017, Dr. John Grych, who was the current Chair of the Department of Psychology at that time sent an offer letter ("Offer Letter") offering Dr. Tiger an Associate Professor with tenure position in Marquette's Department of Psychology.  Part of this offer included laboratory space, which included six, 3-meters by 3-meter therapy rooms, of which two of these rooms would be padded.  Each room was to have a one-way observation mirror, with an adjoined observation space.  (Attached as **Exhibit A** is a true and correct copy of the Offer Letter).

19.     The Offer Letter outlined the activities of the Tiger Center as part of Dr. Tiger's employment at Marquette as well as administrative and financial support for the activities of the Tiger Center.

20.     The offer letter committed the use of laboratory/clinic space to house activities of The Tiger Center relating to practicum training of students and the parties agreed that the Tiger Center and Dr. Tiger should have use of this space for the duration of Dr. Tiger's employment at Marquette.

21.     The offer letter provided funding for a limited number of doctoral students to aide in the operation of the Tiger Center and established a contractual rate for creating additional positions that could be funded by the Tiger Center.

22.     The offer letter acknowledged that while housing the activities of the Tiger Center, Marquette did not claim any financial ownership of the Tiger Center.

23.     On March 8, 2017, Marquette and Dr. Tiger entered into a Contract for the 2018-2019 academic year whereby Dr. Tiger and The Tiger Center would move from UWM to Marquette.  (Attached as **Exhibit B** is a true and correct copy of the Contract.  This copy is unsigned but upon information and belief Marquette has retained the signed copy).

4

24.     Dr. Tiger began his position as an Associate Professor at Marquette University and began to employ Marquette students as practicum trainees via the Tiger Center in August 2018.

25.     In January 2019, construction and renovation on the Behavior Analysis building was completed. Dr. Tiger's faculty office was located in this building as were the six therapy rooms and attached observation rooms allocated to the Tiger Center.

26.     Dr. Tiger and representatives from Marquette University entered into general discussions about a lease arrangement. A lease arrangement was never executed, but Marquette Administrators were both aware of and verbally agreed to commit this space to the operations of the Tiger Center. Dr. Woods maintained an office in this building. Drs. Heidi Bostic and Kimo Ah Yun, Marquette's Provost, both toured the Tiger Center's space.

27.     The Tiger Center executed a Marquette University Educational Research Agreement in 2019, Contract 20-00041155 to provide additional doctoral student funding. This agreement was renewable for up to three years.  (Attached as **Exhibit C** is a true and correct copy of this Agreement)

28.     Between 2018 and 2022,with Dr. Tiger serving as the Behavior Analysis Program Director, the program saw steady growth in enrollment, consistently exceeding the enrollment targets set by Marquette University.

29.     Between 2018 and 2022, the Tiger Center experienced steady growth and profitability. The Tiger Center served as a practicum training site and employer for 17 master's students and 7 doctoral students during that time.

30.     Master's Students who were hired as employees by The Tiger Center also entered into Practicum Supervision Agreements. Marquette was not a party to these Agreements. (Attached as **Exhibit D** is a true and correct copy of the Practicum Supervision Agreement, with

the student's names redacted for privacy). In other words, these Agreements were executed independent of any involvement with Marquette.

31.     As a tenured faculty member at Marquette, Dr. Tiger was subject to the Marquette Handbook for Full-Time Faculty, including the Marquette University Faculty Grievance Procedure.

32.     Between 2011 and 2021, no student, trainee, or employee had ever lodged a complaint against Dr. Tiger as a faculty member, teacher, practicum supervisor, or employer. Additionally, no complaints were lodged against the Tiger Center from 2011-2021 concerning supervision, training, employment practices, safety, or any other issue.

***The False Allegations Made by HE Against Dr. Tiger***

33.     HE[1] worked with Dr. Tiger as a Master's student beginning in 2017. She voluntarily elected to follow Dr. Tiger to Marquette  in 2018, and was then admitted as a doctoral student by Dr. Tiger in 2019.

34.     HE was a Board-Certified Behavior Analyst and, as a doctoral student, received a graduate assistantship to aid Dr. Tiger in providing practicum supervision to Tiger Center employees and practicum trainees.

35.     The typical timeline between beginning a Master's program and completing the Ph.D. Program is 4 to 5 years. HE was delayed in meeting several of her requirements in both the Master's and Ph.D. programs.

36.     Entering into the 2020-2021 school year, HE failed to initiate her dissertation, a requirement of graduation.

37.     During the Fall semester of the 2021- 2022 school year, it became apparent that

---

[1] HE's full name has been redacted for privacy.

HE would not be able to complete her intended dissertation project in time to satisfy the program requirements and would not graduate in the Spring of 2022 as she intended.

38.     Shortly after Dr. Tiger discussed the situation with HE, and unbeknownst to Dr. Tiger, HE began making wide-ranging, outlandish and defamatory comments about Dr. Tiger to other students.

39.     Unbeknownst to Dr. Tiger, HE began making false accusations to other students that Dr. Tiger had sexually harassed and assaulted her. The nature of these allegations varied widely across students.

40.     In June of 2022, after being unable to defend her dissertation, HE began a retributive campaign against Dr. Tiger and the Tiger Center.

41.     On June 2, LC, a practicum trainee who was directly supervised by HE, and who was told false stories about Dr. Tiger sexually assaulting HE, met with Dr. Woods, the Vice Provost for Graduate and Professional Studies. LC conveyed concern to Dr. Woods for HE based upon her reports of assault. As a mandatory reporter, Dr. Woods notified the Marquette University Title IX office about these statements.

42.     On June 6, HE then met with Dr. Woods and falsely accused Dr. Tiger of sexually assaulting and sexually harassing her, as well as a variety of other forms of professional misconduct. Dr. Woods notified the Marquette University Title IX office of these allegations. Dr. Woods also contacted Dean Bostic and Dr. Stephen Saunders ("Dr. Saunders") (Chair of the Psychology Department) to inform them of the allegations against Dr. Tiger.

43.     As a result of HE's false accusations, Marquette provided various counseling services and informed HE of her ability to file a Title IX complaint.

44.     On June 20, 2022, Dr. Tiger met with Dean Bostic and Dr. Saunders pertaining to

unspecified concerns arising surrounding the Tiger Center and Dr. Tiger.

45.     At this meeting, Dean Bostic removed Dr. Tiger from his position as Director of the Behavior Analysis Program without any opportunity for Dr. Tiger to understand or review the allegations or object to his removal.

46.     At this meeting, Dean Bostic informed Dr. Tiger that she would be launching an investigation of the practices of the Tiger Center and Dr. Tiger and that both would be under intense scrutiny.

47.     On or about June 20, 2022, a complaint of sexual harassment and assault was filed by HE, against Dr. Tiger (the "Allegation").

46.     Dr. Tiger vehemently denied the accusations in the Allegation.

47.     Pursuant to Marquette University Sexual Harassment and Sex Discrimination Policy (the "Policy") an investigation ensued, led by the Acting Title IX Coordinator, Cara Hardin.

48.     In addition to investigating any complaints made pursuant to the Policy, the Policy also mandates protection for anyone that participates in the investigation from retaliation.

49.     The Title IX investigation into HE's allegations included interviews with 11 witnesses including Marquette students and faculty members, and collecting written statements from HE, Dr. Tiger, and other relevant witnesses.

50.     Throughout the process, and ultimately the hearing, Dr. Tiger fully cooperated with the investigation of the Allegation.

51.     This investigative process culminated in a live hearing with key witnesses heard by a panel of three decision makers, which in Dr. Tiger's case consisted of two Marquette professors, and an attorney (the "Hearing Panel").

51.     Ultimately the truth prevailed, and Dr. Tiger was found "Not Responsible" on all

counts. The Hearing Panel determined that there was insufficient evidence of any Allegation of sexual harassment, assault or any related violations by Dr. Tiger against HE.

52.     The Title IX Hearing Panel made particular note of *the many credibility deficits in the complainants' accusations* in drafting their decision.

***Marquette and Dean Bostic's Retaliatory Action Against Dr. Tiger and the Tiger Center Immediately Following the Allegation***

53.      HE's Allegations to Dr. Woods initiated the Title IX investigation by Cara Hardin, but also set off a series of retaliatory acts and improper conduct by Dean Bostic and Marquette.

54.     Upon or around the time of the June 2022 Allegation, Dean Bostic learned of HE's Title IX Allegation. Upon information and belief, Marquette did not inform Dean Bostic that she was not permitted to take disciplinary action or retaliate against Dr. Tiger relating to these allegations.

55.     Upon information and belief, Dean Bostic was aware of the substance of HE's allegations and believed those allegations to be true.

56.     Upon information and belief, because Dean Bostic believed HE's Allegation, and believed Dr. Tiger to be guilty of serious Title IX violations, including alleged sexual assault. She personally desired to see Dr. Tiger removed from his leadership positions, teaching positions, desired to see the Tiger Center closed, and desired to harm Dr. Tiger and his business, the Tiger Center, through any means available to her.

57.     Immediately after HE voiced her complaints against Dr. Tiger, Dean Bostic and Marquette University jumped to reactive, uninformed, improper, and wrongful conclusions about Dr. Tiger and the Tiger Center.

58.     Following HE's Allegation, but prior to any investigation, Dr. Tiger was removed as the Director of the Behavior Analysis program.

59.     Following HE's Allegation, but prior to any investigation, Dean Bostic, Dr. Woods, and Dr. Saunders discussed sanctions against Dr. Tiger, including removal of the Tiger Center as a practicum training program for Marquette University students.

60.     Following HE's Allegation, but prior to any investigation, Dr. Tiger's teaching duties were reassigned.

61.     As a result of Dean Bostic's actions, Dr. Tiger was removed as the Director of the Behavior Analysis program before the Title IX matter had been investigated or concluded, without any process, and without any opportunity to understand the reasons for such removal or defend himself against the removal.

62.     After hearing about HE's complaint, and after prematurely and wrongfully taking the actions described above, Marquette and Dean Bostic used subterfuge and bluff, and for the first time ever alleged that safety and other complaints related to Dr. Tiger and The Tiger Center.

63.     Marquette and Dean Bostic's allegations of safety concerns were a fabricated justification for their retaliatory action against Dr. Tiger and The Tiger Center following HE's complaint. Up until June 2022 there had never been an investigation into the safety concerning Dr. Tiger or the Tiger Center, and there had never been any prior disciplinary action taken against The Tiger Center or Dr. Tiger.

64.     At the time Dean Bostic announced her intentions to launch her own investigation, the only formal complaints which had been made against the Tiger Center or Dr. Tiger were HE's accusations which led to the Title IX investigation. No safety related complaints had been lodged against Dr. Tiger or the Tiger Center.

65.     Upon information and belief, Dr. Woods and Dean Bostic discussed concerns that Marquette's  Title IX office would not provide an adequate investigation or response to HE's

complaints.

66.     In an unprecedented move, Dean Bostic and Marquette initiated a separate investigation or "evaluation" into the "Tiger Center's climate" when in reality it was an investigation into Dr. Tiger and his teaching and training practices without any evidence of problems justifying disciplinary or immediate intervention.

***Bostic and Marquette's Improper Investigation of Alleged Safety Concerns Involving Dr. Tiger and the Tiger Center***

67.     Rather than follow the grievance procedure or any other disciplinary investigation procedure outlined in the Marquette Handbook for Full-Time Faculty (the "Handbook"), Marquette and Dean Bostic crafted their own arbitrary procedure for evaluating Dr. Tiger and the Tiger Center.

68.     Upon information and belief, Marquette has never engaged in any similar safety or other investigation of faculty outside the protocols of the applicable Handbook.

69.     Prior to HE's Allegation, Marquette and Dean Bostic had raised no safety or other concerns relating to Dr. Tiger or the Tiger Center.

70.     In fact, no safety concerns were raised to Dr. Tiger or the Tiger Center prior to HE's Allegation.

71.     To date, it is unclear what alleged safety issues or complaints were raised necessitating immediate and formal investigation following HE's Allegation.

72.     Upon information and belief, no legitimate safety complaints or concerns existed, and Marquette's supposed safety investigation was a pretextual means for Dean Bostic and Marquette to punish Dr. Tiger and the Tiger Center for perceived wrongdoing in connection with HE's Allegation.

73.     Following HE's allegation, Dean Bostic commissioned her own investigation into

11

the purported safety concerns allegedly perpetuated by Dr. Tiger and the Tiger Center.

74. This "safety-related" investigation into Dr. Tiger and the Tiger Center was required to be entirely separate from the contemporaneous Title IX investigation that was also occurring relating to HE's Allegation.

75. Separation of the Title IX investigation was necessary, and required, to ensure that Marquette, Dean Bostic, and the panel she assembled to conduct this investigation were not improperly biased or swayed by the Title IX allegations which, at the time, had not yet been fully investigated or resolved.

76. From the outset, Marquette and Dean Bostic's investigation was plagued with problems. As an initial matter, no member of the three-person panel was a qualified investigator.

77. No member of the three personal panel shares Dr. Tiger's experience or expertise working with individuals displaying severe challenging behavior.

78. Exacerbating these deficiencies, from its inception, the three-person investigatory panel was not given clear directions and was unsure of what their investigatory task was supposed to be.

79. Members of the panel believed they were investigating the "climate" of Dr. Tiger's classes and practicum placement at the Tiger Center and were not limited to investigation of "safety" issues. Concerningly, this broad directive of investigating the "climate" resulted in substantial and clear overlap between the supposed safety investigation and Title IX allegations.

80. Compounding this lack of clear direction is the fact that one of the three members, Dr. Woods, met with HE prior to any safety investigation to discuss her Title IX Allegation. Upon information and belief, Dr. Woods was familiar with the specific details of the Allegation and believed HE's Allegation to be true.

81.     After meeting with HE, Dr. Woods escalated HE's complaints to Marquette's Title IX department and provided resources for HE to make a Title IX complaint.

82.     Although Dr. Woods conduct in this regard is not improper, Dr. Woods was inextricably involved with HE's Title IX Allegation and could not serve as an impartial or unbiased evaluator of Dr. Tiger or the Tiger Center in a contemporaneous safety investigation.

83.     Upon information and belief, all three of the panel members were aware of HE's Allegation during the investigation, including the factual details underlying HE's Allegation. Upon information and belief, the panel considered HE's Allegation in its investigation and believed HE's Allegation to be true.

84.     Not only was the supposed safety investigation contaminated with Title IX bias by virtue of who was on the panel, but the methodology used by the panel was also improper.

85.     Logically, an investigation into the safety practices of Dr. Tiger and the Tiger Center would require an examination and observation of those practices by the investigation panel. However, no observation or examination occurred. The panel did not observe any classes or sessions at the practicum site to evaluate safety. The panel did not seek to review any practicum training records, client records, or other documentation kept by Dr. Tiger or the Tiger Center.

86.     Instead, the panel's sole methodology was to issue a subjective survey to students of Dr. Tiger requesting information about the "climate" of the Tiger Center and prompting students to respond concerning how they felt about various safety and other issues.

87.     This methodology is inherently suspect as it does not properly evaluate or attempt to understand the safety policies and procedures in place. Further, the formulation of the survey questions was suggestive of wrongdoing and questions were designed to solicit negative responses.

88.     Despite allegedly being an investigation into the Tiger Center rather than an

13

investigation into Dr. Tiger, the survey asked specifically for the adequacy of supervision and content coverage provided explicitly by Dr. Tiger, despite the fact that multiple other licensed, Board-Certified Behavior Analysts provided supervision to trainees at the Tiger Center.

89.    The survey included many vague questions about safety and climate generally and also included questions which improperly solicited Title IX related information. Including questions which  asked about the culture of The Tiger Center, and information about communication with supervisor, Dr. Tiger, outside of The Tiger Center

90.    Additionally, Dr. Tiger was already under a Title IX investigation when the "safety" investigation was initiated and, upon information and belief, the students responding to the proposed survey were aware of the investigation creating bias and confusion. Further,  students were not aware that responding to Dean Bostic's survey and interviews was separate from the Title IX investigation.

91.    Nonetheless, the panel proceeded to develop a subjective student survey as its sole and primary criteria for evaluation. The survey that the panel developed was ultimately reviewed by Marquette's Title IX department.

92.    Upon information and belief, the Title IX department highlighted multiple questions that solicited Title IX information and indicated that these questions should be removed.

93.    Upon information and belief, no Title IX questions or information were removed.

94.    Unsurprisingly, after the survey was administered, the panel admitted that it received Title IX information in response to the questions.

95.    Rather than attempting to engage in a different form of evaluation that did not solicit Title IX information, the panel proceeded to review the survey and relied on Title IX information in its evaluation of Dr. Tiger and the Tiger Center.

14

96. Exacerbating an already flawed investigation, the panel admits that it did not compartmentalize or disregard Title IX information, but instead proceeded to offer one-on-one and small-group meetings with students before a female panel member to discuss the Title IX allegations in greater detail.

97. Upon information and belief, a group of responding students were aware of HE's Allegation. These students met in advance of their interview with the female panel member in support of HE and in an effort to corroborate the stories they would share with this investigation. This group then participated in the small-group interview along with HE.

98. Ultimately, although the panel was not permitted to consider any ongoing Title IX allegations, especially allegations which had not yet been investigated or resolved, including those allegations made by HE and spread to other students, each member of the panel was aware of HE's allegations and all panel members actively solicited Title IX information in the course of the "safety" investigation.

99. Consequently, the panel's investigation is incontrovertibly contaminated by Title IX allegations, and the panel strongly considered Title IX allegations raised against Dr. Tiger when making its recommendations and would not have made its recommendations without consideration of Title IX allegations and information.

100. In addition to these issues, due to the ongoing Title IX allegations, the panel was also pressured by Marquette to create a report and recommendations quickly, with the panel being asked to commission its survey and finalize its reports within a few weeks.

101. Upon information and belief, because of this desire to provide a quick recommendation, the panel did not engage in a thorough examination or evaluation of the alleged "safety concerns."

102.   In fact, at no point did the panel observe Dr. Tiger's classes, therapy sessions, or attempt to observe the Tiger Center in action to evaluate safety concerns. The panel did not request or review any client records, supervision documentation, or trainee performance reviews.

103.   Upon information and belief, the desire for rapid intervention was driven by the contemporaneous Title IX allegations of HE and the desire to remove or punish Dr. Tiger, and not by any legitimate safety issue.

104.   Further, during the panel's investigation, Dr. Tiger was never provided an opportunity to respond to or provide evidence, or participate in the Grievance process, as a part of this investigation.

105.   The panel ultimately did provide recommendations to Dean Bostic. However, the panel differs on its recollection of what those recommendations were.

106.   Upon information and belief, some panel members recommended that additional supervision and support to the Tiger Center and Dr. Tiger be provided and did not recommend closure of the Tiger Center or practicum. To date, the panel's recommendations have not been provided to Dr. Tiger, the Tiger Center, or counsel.

***Dean Bostic and Marquette's Additional Efforts to Improperly Punish Dr. Tiger and the Tiger Center***

107.   The panel's report and recommendations were provided to Dean Bostic.

108.   However, Dean Bostic was also aware of HE's false Title IX allegations, and upon information and belief, developed a personal animus against Dr. Tiger as a result. In fact, despite a previously cordial relationship, Dean Bostic avoided social contact with Dr. Tiger and began behaving rudely to Dr. Tiger when she encountered him outside Marquette.

109.   Despite these facts, Dean Bostic was improperly tasked with reviewing the "climate" investigation into the Tiger Center, and Dr. Tiger, and was also given decisional

authority concerning the Tiger Center's operations.

110.    After receiving the panel's hastily compiled report, within only 48 hours, Dean Bostic abruptly closed The Tiger Center and notified the practicum trainees and employees of the Tiger Center that they were no longer permitted to work at or receive training at the Tiger Center.

111.    In addition to not being able to participate in any panel investigation or even respond to the panel, Dr. Tiger was not provided with an opportunity to appeal the panel's decision.

112.    The impacted practicum trainees were notified that their practicums were canceled almost immediately after Dr. Tiger received the Dean Bostic's decision that The Tiger Center was going to be closed, in violation of Marquette's Disciplinary policy and procedures.

113.    To date, it is unclear what recommendations were made by the panel, why those recommendations were made, and if Dean Bostic followed the panel's recommendations because the report has been withheld from Dr. Tiger and the Tiger Center.

114.    Upon information and belief, Dean Bostic intentionally chose not to implement the recommendations of the panel but chose to place more restrictions on Dr. Tiger and the Tiger Center than what was supported or endorsed by the panel.

115.    Upon information and belief, Dean Bostic intentionally ignored Title IX policy that stated that only the Title IX coordinator may implement or approve an emergency removal of a Marquette faculty member.

116.    Dean Bostic and Marquette did not follow Marquette Handbook policies, including the Sexual Harassment Policy, or procedures in disciplining Dr. Tiger, including removal of Dr. Tiger as a Director of the Behavior Analysis Department and material alteration of Dr. Tiger's teaching duties and activities.

117.    The Offer Letter explicitly outlined, specified, and approved the activities of the

Tiger Center as part of Dr. Tiger's employment at Marquette.

118. The continued operation of The Tiger Center, and the promised clinical space for the Tiger Center, at Marquette was the primary reason Dr. Tiger agreed to relocate from UWM to Marquette.

119. In accepting the teaching position at Marquette, Dr. Tiger was subject to all Marquette Policies and Procedures.

120. This supposed safety "investigation" did not follow any Grievance Procedure or other procedure as outlined in the Marquette Handbook for Full-Time Faculty.

121. Nonetheless, the claims investigated by Marquette University and Dean Bostic against Dr. Tiger and The Tiger Center were false and unsupported.

122. Despite working with a population that engages in chronic dangerous behavior, there have been minimal injuries to staff or patients due to the safety precautions, staffing, and supervision provided in the Tiger Center's therapeutic training environment. There were no violations that, even if true, would have come close to a level where any disciplinary action needed to be taken.

123. These disciplinary actions were undertaken with wrongful and misleading intent and were undeniably retaliatory in reaction to HE's Allegation.

124. Although no specific safety violations or issues were ever raised by Marquette, and HE's Title IX complaint was resolved in Dr. Tiger's favor in March 2023, Marquette and Dean Bostic have held to their decision. Marquette's campus remains closed to, and Marquette Graduate students remain prohibited from seeking practicum training at the Tiger Center. Dr. Tiger and the Tiger Center have still not been approved to resume practicum supervision in the Fall of 2024, and are still to be subjected to enhanced scrutiny for years to come. Further, Dr. Tiger has not been reinstated as the Behavior Analysis Program Director.

***Dean Bostic and Marquette Improperly Discloses Investigation Documents to Other Faculty in an Attempt to Punish Dr. Tiger***

125.    Upon information and belief, Marquette and/or Dean Bostic then provided other professors with Dr. Tiger's confidential employment documentation. Dean Bostic shared the students' survey results and aspects of the investigation with other professors, including Dr. Kodak.

126.    Upon information and belief, after Dean Bostic shared the survey results and/or HE complaints with other professors and/or students, these same professors and/or students filed anonymous complaints against Dr. Tiger with the State of Wisconsin Office of Inspector General, the state licensing board, and the Behavior Analyst Certification Board (BACB) including sections of Dr. Bostic's survey results.

127.    For example, Dr. Kodak filed an ethics complaint with the BACB, on or about May 29, 2023.

128.    In that complaint, Dr. Kodak alleges that Dr. Tiger failed to report the "investigation of Dr. Tiger's clinic and the outcomes imposed on Dr. Tiger as a result of the investigation [that] occurred in 2022."

129.    Dr. Kodak goes on to state that in that complaint that "[i]n summer of 2022, Dr. Doug Woods (Dean of the Graduate School at Marquette University) and I received numerous student complaints related to Dr. Tiger's clinical work, supervision, and behavior toward students. Due to the nature and extent of the student complaints, a committee was formed that included Dr. Doug Woods, Dr. Tyra Sellers (serving in the role of an expert on BACB ethics codes and supervision practices), and Dr. John Grych (Professor of Psychology who previously served as the Department Chair).

130.    She advised BACB that the committee sent a Qualtrics survey to all former

19

Marquette University **supervisees of Dr. Tiger**, and the committee also interviewed many of the former supervisees.

131. Dr. Kodak further stated that data from the survey of **Dr. Tiger's supervision and practices are below,** as is a summary of the findings. Dr. Kodak's complaint clearly indicates to BACB that the investigation was of Dr. Tiger and confirms that Dr. Kodak was provided with confidential information relating to the safety investigation.

132. Dr. Kodak went on to advise the BACB that the "safety concerns" investigation determined that Dr. Tiger and the Tiger Center (the clinic owned by Dr. Tiger) was no longer to serve as a practicum training site for at least two years, and further went on to provide a summary of the outcomes of the investigation, where most of these outcomes were focused almost entirely on Dr. Tiger.

133. Upon review of the materials submitted by Dr. Kodak, the BACB found no evidence of a violation and declined to enact any disciplinary sanctions against Dr. Tiger, despite reviewing the same data that supposedly led Dean Bostic to terminate the Tiger Center as a practicum placement.

134. Dr. Tiger was never provided with an opportunity to respond formally to Dean Bostic's investigation or participate in the Marquette University Grievance Procedure as permitted by the Faculty Handbook.

135. Instead, Dean Bostic improperly used her position of power to initiate this investigation and violated Dr. Tiger's due process and privacy rights in furtherance of her personal vendetta against Dr. Tiger falsely believing he committed the acts HE alleged in her Title IX complaint.

136. Dean Bostic also improperly used her position of power to manufacture a "safety

investigation" of The Tiger Center, when in reality this investigation was an investigation into Dr. Tiger's supervision, teaching methods, and the "climate" Dr. Tiger created in an attempt to avoid following the Grievance Procedure outlined in the Marquette Handbook for Full-Time Faculty.

## THE TIGER CENTER'S FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

137.    Plaintiff realleges and reasserts each prior paragraph as though specifically set forth herein.

138.    Since 2018, The Tiger Center had been operating as a separate legal for-profit entity at Marquette.

139.    The Tiger Center offered practicum training to students and hired these trainees to assist with providing therapy to patients of The Tiger Center.

140.    The Tiger Center entered into a binding agreement with Marquette to operate out of space at Marquette for the duration of Dr. Tiger's employment at Marquette, including the operation of a practicum training program.

141.    Marquette breached the agreement by allowing Dean Bostic to implement sanctions against the Tiger Center, prohibiting students from receiving practicum supervision and essentially constructively evicting The Tiger Center without cause and in violation of the parties' contract and applicable Marquette policies.

142.    Additionally, Marquette has notified Dr. Tiger that the 525 building that housed the Behavior Analysis Program and the Tiger Center has been sold and that Marquette intends to further breach the agreement by failing to provide laboratory space for the Tiger Center to conduct its operations as outlined in the Offer Letter.

143.    Since 2018, The Tiger Center fully performed all of its obligations under the agreement between the parties.

144.    As a direct and proximate result of Marquette's breach, The Tiger Center has suffered pecuniary damages.

### THE TIGER CENTER'S SECOND CAUSE OF ACTION
### TORTIOUS INTERFERENCE

145.    Plaintiff realleges and reasserts each prior paragraph as though specifically set forth herein.

146.    The Tiger Center had valid and enforceable contracts with third parties, and also had prospective contractual relationships with third parties, or families who had children with intellectual and developmental disabilities that required therapy to assist in the treatment and management of behaviors that have become harmful, dangerous or destructive to themselves or those around them.

147.    The Tiger Center employed practicum trainees and others, independent of any Marquette involvement.

148.    Part of the treatment and therapy involved working with a therapy team, comprised of Dr. Tiger and practicum trainees and employees.

149.    Defendants knew or reasonably should have known of the existence of these contracts and prospective contracts.

150.    Defendants intentionally and abruptly constructively evicted The Tiger Center without any basis or notice and/or without good cause, precluding Marquette undergraduate and graduate students from receiving practicum learning experience, abruptly precluding patients from receiving care and essentially firing the Tiger Center's employees which interfered with The Tiger Center's patient contracts and prospective contracts.

150.    Defendants also intentionally interfered with contracts with Marquette students employed by the Tiger Center outside of any class or practicum placement by discouraging such

employment and/or contacting these individuals and informing them they were no longer permitted to work for the Tiger Center.

151.    Defendants intentionally interfered with and deprived The Tiger Center of the means of performance. This caused nonperformance of third-party contracts with patients and providers.

152.    Defendants' interference has also prevented The Tiger Center from entering into prospective contracts with third parties.

153.    Marquette's interference was improper and without privilege or justification.

154.    As a direct and proximate result of Defendants' interference, The Tiger Center has sustained pecuniary damage.

**DOCTOR TIGER'S FIRST CAUSE OF ACTION**
**<u>BREACH OF CONTRACT</u>**

155.    Plaintiff realleges and reasserts each prior paragraph as though specifically set forth herein.

156.    Since 2018, Dr. Tiger has been a professor of psychology at Marquette.

157.    Dr. Tiger has taught courses in the behavior analysis program and offered practicum training to students through the clinic he ran at Marquette, The Tiger Center.

158.    Dr. Tiger entered into a binding agreement with Marquette to be a professor at Marquette and was subject to Marquette policies and procedures, including those policies and procedures protecting tenured professors.

159.    Marquette, and Dean Bostic, breached the agreement by allowing Dean Bostic to implement sanctions against Dr. Tiger and take sanctions that were in violation of the employment contract and Marquette policies and procedures, including but not limited to, forcing Dr. Tiger to resign as Director of the Behavior Analysis Program at Marquette without process, taking

23

disciplinary action against Dr. Tiger without following proper protocol, prohibiting students from receiving practicum supervision and sending a survey to each graduate student who were concurrently serving as witnesses in the Title IX investigation, not abiding by the grievance procedures outlined in the Marquette Handbook for Full-Time Faculty, and sharing the findings of the "safety" investigation with other students and/or professors.

160.    Since 2018, Dr. Tiger fully performed all of his obligations under the agreement between the parties.

161.    As a direct and proximate result of Marquette's breach, Dr. Tiger has suffered pecuniary damages.

## DOCTOR TIGER'S SECOND CAUSE OF ACTION
## TITLE IX RETALIATION

162.    Plaintiff realleges and reasserts each prior paragraph as though specifically set forth herein.

163.    Dr. Tiger fully cooperated with Marquette's investigation, including providing testimony in the investigation and during the hearing.

164.    As a result, Dr. Tiger engaged in protected activity pursuant to Title IX and pursuant to Marquette policy and procedures.

165.    Marquette took materially adverse action against Dr. Tiger, including disciplinary action against Dr. Tiger in retaliation for his participation in the Title IX proceedings, including forcing Dr. Tiger to resign from his position as Director of the Behavior Analysis Program, closure of the Tiger Center, and precluding Dr. Tiger from hiring or recruiting graduate students to work at the Tiger Center for credits or otherwise, and placing numerous restrictions on Dr. Tiger's ability to conduct such work in the future.

166.    Dr. Tiger was charged and investigated for unspecified conduct or safety violations

that arose from the same facts and circumstances that resulted in a Title IX investigation, specifically HE's Allegation

167.    But for Dr. Tiger's participation in protected activity in connection with the Title IX allegation and investigation, Marquette would not have taken the above actions.

168.    Although Dr. Tiger was ultimately exonerated of any wrongdoing in the Title IX proceeding, Marquette retaliated and took action before the proceedings had concluded and has refused to reverse its determinations concerning Dr. Tiger's position at Marquette and ability to hire or recruit graduate students.

169.    As a result of the foregoing retaliation, Dr. Tiger has suffered pecuniary damages.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants as follows:

    a.    For compensatory damages in an amount to later be determined;

    b.    For punitive damages in an amount to later be determined;

    c.    For attorney's fees and costs;

    d.    For such other and further as the Court may deem just and equitable.

**DEMAND IS HEREBY MADE FOR A JURY OF 12 PERSONS.**

Dated at Milwaukee, Wisconsin this 19th day of December, 2023.

**THE ROSE GROUP, S.C.**
*Attorneys for the Plaintiffs*

*Electronically signed by Douglas W. Rose*

By:_____
Douglas W. Rose
State Bar No. 1017205
Jennifer Geller Baumann
State Bar No. 1034916
Kaitlynn E. Ebben
State Bar No. 1112777

25

**P.O. Address**
The Rose Group, S.C.
1134 N. 9th Street, Ste 220
Milwaukee, WI 53233
(414) 274-1400
dwr@rosegrouplaw.com
jgb@rosegrouplaw.com
kee@rosegrouplaw.com