# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| TIGER CENTER FOR APPLIED BEHAVIOR ANALYSIS SERVICES, LCC, and JEFFREY TIGER, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.: 2:23CV01540 |
| MARQUETTE UNIVERSITY and HEIDI BOSTIC, | ) ) ) | Honorable Pamela Pepper Magistrate Judge Duffin |
| Defendants. | ) ) | |

## DEFENDANT MARQUETTE UNIVERSITY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

Dr. Jeffrey Tiger ("Dr. Tiger"), a faculty member at Marquette University ("Marquette" or the "University"), had responsibilities for overseeing a practicum through which Marquette students completed clinical experiences at Dr. Tiger's privately-owned company, the Tiger Center for Applied Behavior Analysis Services (the "Tiger Center"), in exchange for course credit. However, after multiple concerns were raised, Marquette conducted an assessment of the safety, culture, and quality of education and supervision in that practicum program which resulted in the University suspending the practicum program for the safety of Marquette's students.

Dr. Tiger and the Tiger Center (collectively, "Plaintiffs") brought a lawsuit against Marquette alleging that this assessment and corresponding decision were done in retaliation for Dr. Tiger's then-ongoing role as a respondent in a Title IX sexual harassment and misconduct investigation at the University, despite the fact

that this investigation (which was separate and apart from the practicum-related concerns) was resolved in Dr. Tiger's favor and he was found not responsible for the alleged Title IX violation. In the Amended Complaint, Dr. Tiger brings claims for Title IX retaliation and breach of contract, and the Tiger Center brings claims for breach of contract and tortious interference with contracts and prospective contracts.[1] Marquette respectfully requests that the Amended Complaint be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

## FACTS[2]

### I. Dr. Tiger's Employment and Marquette's Relationship with the Tiger Center

Dr. Tiger began working as a professor of psychology at Marquette in 2018. Am. Compl. ¶¶ 23-24. He was sent an Offer Letter on February 20, 2017, through which Marquette offered him an Associate Professor position in the Department of Psychology beginning August 15, 2018. Am. Compl. at Ex. A (cited herein as "Ex. A"). This Offer Letter stated the faculty "appointment, should [Dr. Tiger] accept, is subject to the University's statutes on Faculty Appointment, Promotion, and Tenure" and that Dr. Tiger, as a faculty member, would agree to comply with Marquette's policies, "including those found in the Faculty Handbook." Ex. A. The Offer Letter outlined expectations for Dr. Tiger's role in organizing and administering Marquette's undergraduate and graduate programs in behavioral analysis, with graduate

---

[1] On December 19, 2023, in response to motions to dismiss brought by Marquette and Dr. Heidi Bostic, Plaintiffs filed their Amended Complaint. Dkt. 11. Although Dr. Bostic is still named in the caption of the Amended Complaint, she has been dismissed from this action. Dkt. 12, 13.

[2] Marquette strongly disputes many allegations in the Amended Complaint but assumes them to be true solely for purposes of this motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

HB: 4881-6047-8106.7

assistantships to be funded through a future revenue sharing agreement, as well as—at a very high level—expectations that Dr. Tiger would engage in University-specific research. *Id.* Marquette stated that while it was still "evaluating facilities options," it would provide Dr. Tiger with laboratory space to include "six (6), 3-m by 3-m therapy rooms, of which two (2) will be fully padded[.]"[3] *Id.*; *see also* Am. Compl. ¶ 18.

The Offer Letter also stated that Marquette "welcomes Dr. Tiger to offer training through the Tiger Center to Marquette graduate and undergraduate students seeking practicum training in Applied Behavior Analysis" and that Marquette would "offer laboratory/clinic space to house activities of the Tiger Center related to practicum training of these students." Ex. A. Several years prior to his employment at Marquette, Dr. Tiger opened the Tiger Center, a business which provides therapy to "children with severe behavioral challenges" in the Greater Milwaukee area. Am. Compl. ¶¶ 11-14, 146. Dr. Tiger has operated the Tiger Center since 2011. *Id.* at ¶¶ 11-14, 32. In the Offer Letter, Marquette explicitly acknowledged that the Tiger Center "is solely owned and operated by Dr. Tiger" and would remain so. Ex. A. The Offer Letter stated that Dr. Tiger would pay rent for any clinic space used by the Tiger Center, but not for space required for University-specific research. Ex. A. However, a written lease was never executed. Am. Compl. ¶ 26. The Offer Letter also stated that "Dr. Tiger may enter into a separate contractual relationship with Marquette University to provide funded assistantships to graduate students"

---

[3] The Offer Letter also makes reference to a "centralized clinic space to include the behavioral analysis program needs." Ex. A.

HB: 4881-6047-8106.7

who provide services as part of their practicum training, with the Tiger Center "pay[ing] the standard stipend (currently, $15,950)" and Marquette providing the students with tuition credits. Ex. A.

On March 8, 2017, Dr. Tiger and Marquette entered into an "Appointment/Contract" Agreement effective August 13, 2018 through May 19, 2019. Am. Compl. ¶ 23; *id.* at Ex. B (cited herein as "Ex. B"). This "Appointment/Contract" Agreement included provisions for Dr. Tiger's salary and benefits, and stated that Dr. Tiger "agree[d] to comply with applicable Marquette academic and business policies." Ex. B. This Agreement was not with the Tiger Center, does not reference the Tiger Center, does not make any representations regarding laboratory or clinic space available to Dr. Tiger or the Tiger Center, and does not make any representations about any practicums. *See id.*

However, and despite the language in the Offer Letter to the contrary, Plaintiffs describe "the six therapy rooms and attached observation rooms" as "allocated to the Tiger Center." Am. Compl. ¶ 25. They allege that although a "lease arrangement was never executed, [] Marquette Administrators were both aware of and verbally agreed to commit this space," which was housed in a Behavior Analysis building renovated in January 2019, "to the operations of the Tiger Center." *Id.* at ¶ 26. Plaintiffs do not include any other allegations about the terms of this alleged verbal agreement, such as when it was reached, which "Marquette Administrators" entered into the agreement on behalf of Marquette, how long the alleged agreement would be in effect, on what grounds it could be terminated and whether such

HB: 4881-6047-8106.7

termination could only occur pursuant to certain procedures, or what benefit Marquette was provided for granting the Tiger Center such space (*e.g.,* rent).

On July 29, 2019, Marquette and the Tiger Center entered into an Educational Research Agreement effective August 4, 2019, through May 31, 2020. Am. Compl. at Ex. C (cited herein as "Ex. C"); *see also* Am. Compl. ¶ 27. This was signed by Dr. Tiger as the authorized official of the Tiger Center and by the executive director of Marquette's Office of Research and Sponsored Programs. Ex. C.[4] This Educational Research Agreement states that the Tiger Center, as sponsor, would fund the work of Dr. Douglas Woods, the principal investigator, on "the research" at a rate of $17,344 paid by the Tiger Center to Marquette. Ex. C. The Educational Research Agreement primarily discusses Marquette's and the Tiger Center's ownership over the research, and states it is terminable by either party with 30 days' notice. *Id.* Attachment 2 (Scope of Work) to the Educational Research Agreement states that Marquette will use the aforementioned funds to "provide support for a Ph.D. level student . . . who will, in turn, provide staff support to the Tiger Center" by serving as an "assistant trainer in the Tiger Center clinic" and that Dr. Woods would have "overall responsibility of overseeing the project." *Id.* This attachment states that both Marquette and Dr. Tiger will ensure that training of this graduate assistant will "be delivered in a manner that respects the dignity of the individual and conveys the ultimate goal of fostering professional and personal growth for the benefit of the

---

[4] Dr. Douglas Woods also signed an acknowledgement through which he agreed to perform his obligations as principal investigator. Ex. C.

HB: 4881-6047-8106.7

trainee." *Id.* The agreement was "renewable for up to three years of six academic semesters." *Id.*[5] It does not state how such renewal would occur.

Plaintiffs allege that between 2018 and 2022, "[t]he Tiger Center served as a practicum training site and employer for 17 master's students and 7 doctoral students." Am. Compl. ¶ 29. Plaintiffs allege that the "[m]aster's [s]tudents who were hired as employees . . . entered into Practicum Supervision Agreements" which were "executed independent of any involvement with Marquette." *Id.* at ¶ 30. Plaintiffs attach three redacted "Practicum Supervision Agreements" to their Amended Complaint, all of which were signed in August or September of 2021 by a student and Dr. Tiger (although the Tiger Center is identified as the supervisor). Am. Compl. at Ex. D (cited herein as "Ex. D"). These agreements are intended to set the "expectations of the supervisee" (a Marquette graduate student seeking to become a board-certified behavioral analyst ("BCBA")) "and the supervisors." *Id.* These "Practicum Supervision Agreements" state that the "[p]racticum experience will be divided into 1-month periods across approximately 2-years" with each supervisee completing between 20 and 130 hours of "practicum experience per supervision period," but that the "[s]upervisee relationship is considered 'at-will' work and employment" and the "Practicum Supervision Agreement" is effective "until either party terminates" it. *Id.*

---

[5] The Educational Research Agreement contains two additional attachments: Attachment 1, regarding the terms through which the Tiger Center would pay Marquette, and Attachment 3, containing a template student participation agreement primarily regarding ownership of intellectual property and confidentiality provisions. Ex. C.

HB: 4881-6047-8106.7

## II. The Title IX Investigation of Dr. Tiger

In the 2021-2022 school year, a doctoral student who Dr. Tiger advised (as identified in Plaintiffs' Amended Complaint, "HE") reported to other students that Dr. Tiger had sexually harassed and assaulted her. Am. Compl. ¶¶ 37, 39. A practicum trainee heard these allegations from HE and reported them to Dr. Douglas Woods, the Vice Provost for Graduate and Professional Studies. *Id.* at ¶ 41. Because he was a mandatory reporter, Dr. Woods reported these allegations to Marquette's Title IX Office. *Id.* Days later, Dr. Woods met with HE and directly heard her allegations of Dr. Tiger "sexually assaulting and sexually harassing her, as well as a variety of other forms of professional misconduct." *Id.* at ¶ 42. Dr. Woods informed Dr. Heidi Bostic ("Dr. Bostic"), the Dean of the College of Arts and Sciences and the College of Education at the University, and Dr. Stephen Saunders, the Chair of the Psychology Department of these allegations of sexual assault, sexual harassment, and other professional misconduct. *Id.* at ¶ 42. On June 20, Dr. Bostic and Dr. Saunders met with Dr. Tiger surrounding the "unspecified concerns arising surrounding the Tiger Center and Dr. Tiger," presumably the allegations relating to "other forms of professional misconduct." *Id.* at ¶¶ 44, 42.

Separately, the University informed HE of her right to file a Title IX complaint, which she did on June 20, 2022. *Id.* at ¶¶ 43, 47. HE's Title IX complaint was investigated pursuant to Marquette's Sexual Harassment and Sex Discrimination Policy ("the Title IX Policy"). *Id.* at ¶ 47. The Title IX complaint alleged that Dr. Tiger had sexually harassed and assaulted HE. *Id.* ¶ 42. Dr. Tiger "vehemently denied"

HB: 4881-6047-8106.7

these allegations. *Id.* at ¶ 46.[6] The process under the Title IX Policy involved a hearing during which key witnesses and the parties appeared before a Hearing Panel comprised of two Marquette professors and an attorney. *Id.* at ¶ 51. Following a one-day hearing, Dr. Tiger was found **not responsible** for the alleged misconduct. *Id.* at ¶ 51. This determination was reached in March 2023. *Id.* at ¶ 124.

### III.    The Tiger Center Evaluation

In the meantime, Marquette separately conducted an evaluation of the practicum program at the Tiger Center. *Id.* at ¶¶ 45, 66, 74. This evaluation was initiated sometime prior to September 2022 based on "safety and other complaints," although Dr. Tiger asserts that "the only ***formal*** complaint[] which had been made" (whatever he means by "formal") was the aforementioned Title IX complaint by HE, which was made on June 20, 2022. *Id.* at ¶¶ 62-64 (emphasis added). Dr. Tiger alleges that because there was purportedly only one *formal* complaint, and it was a Title IX complaint, the practicum program evaluation was initiated pursuant to "subterfuge and bluff." *Id* at ¶ 62.

The program assessment was conducted by a three-person panel ("the Panel") made up of two University faculty members, Dr. John Grych and Dr. Woods, and one outside consultant, Dr. Tyra Sellers. *Id.* at ¶ 129. The Panel was charged with observing the climate of the Tiger Center and determining whether any recommendations should be made to Dr. Bostic, who then had responsibility for

---

[6] The numbers 46 and 47 are used twice, for distinct paragraphs; that is, there are two paragraphs numbered 46 and two numbered 47, despite each of these four paragraphs having separate allegations.

HB: 4881-6047-8106.7

determining whether any action should be taken. *Id.* at ¶ 105. Although the evaluation was entirely separate from the ongoing Title IX investigation, conducted under different policies and by different administrators, Dr. Tiger alleges that the panel members and Dr. Bostic were "aware" of the Title IX complaint that had been filed against Dr. Tiger. *Id.* at ¶¶ 55, 83.

Because the evaluation was of the Tiger Center and its suitability as a practicum site—and was not a disciplinary investigation of Dr. Tiger as a faculty member—it did not follow the grievance procedures outlined in the Marquette Handbook for Full-Time Faculty. *Id.* at ¶ 67. To assess the practicum program at the Tiger Center, the Panel sent out a survey to current and former students who had completed their practicums at the Tiger Center or had worked there for pay. *Id.* at ¶ 86. The survey asked these students questions about the safety and climate of the Tiger Center generally. *Id.* The Panel also conducted small group and individual interviews with students to gather information. *Id.* at ¶ 96.

Although during these interviews and in response to the survey many students *also* reported information about alleged misconduct which fell under Title IX, the Panel "was not permitted to consider any ongoing Title IX allegations, especially allegations which had not yet been investigated or resolved, including those allegations made by HE and spread to other students." *Id.* at ¶¶ 94, 97. Plaintiffs assert that despite this prohibition, because the Panel "was aware of HE's allegations"—which would ultimately be unsubstantiated—and learned of "Title IX information" during the evaluation, the evaluation was "incontrovertibly

HB: 4881-6047-8106.7

contaminated by Title IX allegations, and the [P]anel strongly considered Title IX allegations raised against Dr. Tiger when making its recommendations." *Id.* at ¶¶ 98-99. Plaintiffs provide no support for this conclusory assertion—for example, they fail to identify any statements by the Panel which could lead to an inference that Title IX allegations were considered. Indeed, Plaintiffs admit that they do not know the contents of the final report. *Id.* at ¶ 113.

The Panel worked diligently over the course of several weeks to issue its survey, conduct student interviews, and finalize its report. *Id.* at ¶ 100. Dr. Tiger alleges that he was not asked to respond to the students' descriptions of their experiences or provide his own evidence, nor was he permitted to appeal the Panel's findings. *Id.* at ¶¶ 104, 111. Notably, he does not identify any policy or contractual term that would give him the right to do any of these things, and, although it does not matter for purposes of resolving this motion, Dr. Tiger had substantial opportunity to—and in fact, did—participate significantly in the program assessment. The Panel presented its final report to Dr. Bostic who reviewed it over the course of two days. *Id.* at ¶ 110. The University then made the decision to suspend the practicum program at the Tiger Center for a period of at least two years. *Id.* at ¶¶ 58, 110 132. Plaintiffs allege that the practicum trainees were "almost immediately" "notified that their practicums were canceled" and that Dr. Bostic "notified the practicum trainees and employees of the Tiger Center that they were no longer permitted to work at or receive training at the Tiger Center." *Id.* at ¶ 110.[7]

---

[7] Plaintiffs refer to Defendants "closing" the Tiger Center itself, Am. Compl. ¶ 110 and "terminating" the practicum program, *id.* at ¶ 133, while also acknowledging that the assessment resulted in a

HB: 4881-6047-8106.7

Plaintiffs also assert that Marquette and/or Dr. Bostic informed other professors and/or students of the results of the Panel's surveys and/or shared information about HE.'s Title IX complaint, and that these third parties filed complaints against Dr. Tiger with the State of Wisconsin and licensing boards. *Id.* at ¶¶ 125-26. The Amended Complaint does not identify any contractual term requiring Marquette or Dr. Bostic to remain silent on matters of professional integrity.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must be supported by allegations that, if taken as true, plausibly suggest that the plaintiff is entitled to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). The court must accept the well-pleaded allegations in the complaint as true; however, legal conclusions and conclusory statements are not taken as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where the well-pleaded facts do not permit the court to infer more than the possibility of misconduct, the complaint has not shown that the plaintiff is entitled to relief as is required by Rule 8. *Id.* at 679.

## ARGUMENT

It is clear that Dr. Tiger is dissatisfied with Marquette's decision to protect its students from what it deemed—following an expert investigation—an unsuitable

---

determination that the Tiger Center "was no longer to serve as a practicum training site for at least two years," *id.* at ¶ 132. To be clear, it is only accurate to say that the practicum program was suspended for a period of two years. Any references to the Tiger Center as an LLC being "closed" by Marquette should be disregarded. The Tiger Center is a private LLC, owned and operated by Dr. Tiger, *see id.* at ¶ 1; Ex. A, and Marquette's authority is therefore clearly limited to whether it offers a practicum program for Marquette students at the Tiger Center, whether Dr. Tiger can be the director of the practicum program, and whether the Tiger Center can operate on Marquette's campus and/or lease space from Marquette.

HB: 4881-6047-8106.7

environment for its students. But that dissatisfaction does not create a cause of action. Rather, if Dr. Tiger wants to air his grievances through litigation, he must do so through claims that are actually actionable as a matter of law. Here, Dr. Tiger and the Tiger Center have failed to sufficiently plead any cause of action. This Court should dismiss this case.

## I.     Plaintiffs Fail to State a Claim for Breach of Contract.

Recognizing that their failure to originally plead the existence of any contractual agreement—much less actually provide this Court with an alleged contract—was a fatal deficiency, Plaintiffs have amended their complaint to now include three purported contracts with Marquette: the September 12, 2017 Offer Letter from Marquette to Dr. Tiger (Ex. A); the 2018-2019 "Appointment/Contract" Agreement between Marquette and Dr. Tiger (Ex. B); and the 2019-2020 Educational Research Agreement between Marquette and the Tiger Center (Ex. C).[8] None of these purported contracts save Plaintiffs' claims.

"Under Wisconsin law, a complaint states a claim for breach of contract when it alleges: (1) a contract between the plaintiff and the defendant that creates obligations flowing from the defendant to the plaintiff; (2) failure of the defendant to do what it undertook to do; and (3) damages." *Fireman's Fund Ins. Co. v. Racine Zoological Soc'y*, No. 21-CV-642-PP, 2022 WL 4467734, at *4 (E.D. Wis. Sept. 26,

---

[8] Plaintiffs do not appear to be arguing that the Practicum Supervision Agreements (Ex. D) support their breach of contract claims. However, to be clear, these documents do not give rise to a breach of contract claim against Marquette, as (to the extent they are even contracts) they are between unidentified students and the Tiger Center, and Marquette is not a party. "Wisconsin courts have long recognized that one cannot enforce a contract against an entity that is not a party to it." *Maciolek v. City of Milwaukee Employees' Ret. Sys. Annuity & Pension Bd.*, 709 N.W.2d 360, 368 (2006).

HB: 4881-6047-8106.7

2022) (quotations omitted); *see also Galena Towing, Inc. v. N. Milwaukee State Bank*, 227 N.W.2d 672, 673 (Wis. 1975) (complaint fails where "the terms of the contract [are not] alleged by either setting forth the substance of the agreement or appending a copy to the complaint").

### A. The Tiger Center does not have a claim for breach of contract premised on an alleged agreement to operate at Marquette.

In Count I, the Tiger Center (not Dr. Tiger) brings a claim for Breach of Contract against Marquette.[9] The Tiger Center alleges that there is a "binding agreement" between Marquette and the Tiger Center through which the Tiger Center could "operate out of space at Marquette for the duration of Dr. Tiger's employment at Maquette, including the operation of a practicum training program," Am. Compl. ¶ 140, and that "Marquette breached the agreement by allowing Dr. Bostic to implement sanctions against the Tiger Center, prohibiting students from receiving practicum supervision and essentially constructively evicting The Tiger Center without cause and in violation of the parties' contract and applicable Marquette policies" and "intends to further breach the agreement by failing to provide laboratory space for the Tiger Center to conduct its operations as outlined in the Offer Letter," *id.* at ¶¶ 141-142. Not only have Plaintiffs failed to identify a specific contractual provision actually stating that the Tiger Center could "operate out of space at

---

[9] Plaintiffs' claims are labeled (1) The Tiger Center's First Cause of Action: Breach of Contract; (2) The Tiger Center's Second Cause of Action: Tortious Interference; (3) Dr. Tiger's First Cause of Action: Breach of Contract; and (4) Dr. Tiger's Second Cause of Action: Title IX Retaliation. These claims are presumably brought against only Marquette, as, again, Dr. Bostic has been dismissed from this action. Dkt. 12, 13. In any event, Dr. Bostic is not a party to any of these agreements and therefore no breach of contract claims may be brought against her. *See Maciolek v. City of Milwaukee Employes' Ret. Sys. Annuity & Pension Bd.*, 709 N.W.2d 360, 368 (2006) ("Wisconsin courts have long recognized that one cannot enforce a contract against an entity that is not a party to it.").

HB: 4881-6047-8106.7

Marquette for the duration of Dr. Tiger's employment," they have also failed to allege: the existence of a contract term prohibiting Dr. Bostic from implementing sanctions against the Tiger Center; that Dr. Bostic implemented sanctions against *the Tiger Center* as opposed to Dr. Tiger; or the existence of any contract term promising Plaintiffs that students would indefinitely be permitted to participate in a practicum at the Tiger Center. Because Plaintiffs have not alleged an enforceable contract nor breach, Count I must be dismissed.

Plaintiffs have identified **only one agreement** between the Tiger Center and Marquette: the Educational Research Agreement at Exhibit C to the Amended Complaint. Accordingly, because that is the only contract that purportedly exists between the two parties at issue in Count I, the Tiger Center must sufficiently plead that the Educational Research Agreement was breached by Marquette. The Amended Complaint fails to do so.

Specifically, this agreement makes no guarantee that the Tiger Center can operate out of Marquette in the first place. In fact, as it relates to facilities, the Educational Research Agreement only states: "MARQUETTE will use reasonable efforts to conduct the Research and will utilize its own facilities as well as those provided by SPONSOR to carry out the Research." Ex. C. Thus, if anything, this term implies that the **Tiger Center** was expected to provide its **own** facilities under the

terms of the agreement.[10] This Agreement, which focuses on research and intellectual property, simply has nothing to do with the alleged breaches at issue in this case.

Nor can the Tiger Center premise its breach of contract claim on the Offer Letter (Exhibit A). As a preliminary matter, the Offer Letter was *an offer*, not a contract; and, in any event, it is between Marquette and Dr. Tiger, not the Tiger Center. *See Rock Hemp Corp. v. Dunn*, 574 F. Supp. 3d 624, 631 (W.D. Wis. 2021), *aff'd* 51 F.4th 693 (7th Cir. 2022) ("The general rule is that only a party to a contract may enforce it"). Even if, however, the Offer Letter could somehow be deemed to give rise to contractual promises from Marquette to the Tiger Center, it simply doesn't say what Plaintiffs claim. And, critically for purposes of this motion, it does not contain the "promises" the Tiger Center alleges.

Indeed, the Tiger Center premises its entire Count I on the allegation that the Tiger Center could "operate out of space at Marquette for the duration of Dr. Tiger's employment." The Offer Letter simply does not say that. In fact, the Offer Letter states that Marquette "will offer laboratory/clinic space to house activities of the Tiger Center **related to practicum training** of [] students" who are "seeking practicum training in Applied Behavior Analysis." Ex. A. It does not state that this space is offered "for the Tiger Center to conduct its operations," as Plaintiffs allege. *See* Am. Compl. ¶ 142; Ex. A.[11] Instead, it specifically ties this space to the practicum training.

---

[10] Moreover, by its plain terms the Educational Research Agreement expired in 2020, years before any alleged breach. And although the agreement contains a term stating it is **renewable**, the Amended Complaint contains no allegations whatsoever about whether or when that agreement was renewed.

[11] To be clear, Plaintiffs premise their argument in Paragraph 142 on an allegation that Marquette is going to breach a contract *in the future*. Am. Compl. ¶ 142 ("Marquette intends to further breach the agreement by failing to provide laboratory space for the Tiger Center to conduct its operations as

HB: 4881-6047-8106.7

Moreover, nowhere does the Offer Letter state that the space Marquette offered for the practicum training cannot be revoked (if, for example, Dr. Tiger created an unprofessional and unsafe environment for students). *See* Ex. A. Put simply, even if the Offer Letter could be the basis for a contract with the Tiger Center, Plaintiffs cannot premise Count I on their misrepresentation of what this Offer Letter actually says. *See St. Francis S. & L. Ass'n v. Hearthside Homes, Inc.*, 221 N.W.2d 840, 843 (Wis. 1974) ("To state a contract cause of action a pleading must, at a minimum, specifically allege the provision of the contract at issue and its breach by the defendant."). In other words, the Tiger Center must identify the specific term(s) of a contract—between the Tiger Center and Marquette—that it alleges were breached. The generalizations (and mischaracterizations) in Count I simply don't cut it.

Likewise, Plaintiffs' representations of a verbal agreement cannot save their claim. A "general discussion[] about a lease arrangement," Am. Comp. ¶ 26, cannot constitute a contract, because even an oral contract requires "an offer, acceptance, a meeting of the minds [and] consideration." *Valoe v. Allstate Ins. Co.*, No. 22-CV-182-PP, 2023 WL 7625820, at *6, *7 (E.D. Wis. Nov. 14, 2023). As explained above, Plaintiffs have not alleged any of the terms of this supposed verbal agreement—no

---

outlined in the Offer Letter"). A speculative future breach is not an actionable claim. *See Peterson v. Equitable Life Assurance Society of U.S.*, 57 F. Supp. 2d 692, 708 (W.D. Wis. 1999) ("In this state, a cause of action for breach of contract accrues when the breach occurs."); *see also e.g.*, *Hatch v. City of Milwaukee*, No. 20-CV-1791-JPS, 2022 WL 17177716, at *8 (E.D. Wis. Nov. 23, 2022) ("Critically, the court wrote that '[a] claim for interference with the right to make and enforce a contract must allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities.'") (citing *Morris v. Off. Max., Inc.*, 89 F.3d 411, 414-15 (7th Cir. 1996)).

16

HB: 4881-6047-8106.7

details about how long it would be in effect, on what grounds it could be terminated and whether such termination could only occur pursuant to certain procedures, or what benefit Marquette was provided for granting the Tiger Center such space (*e.g.,* rent).

There is simply no connection between any alleged contractual term (such as the Tiger Center's use of space at Marquette) and the alleged breach (the implementation of sanctions). Again, to state a breach of contract claim, Plaintiffs must point to a specific contractual promise which has been broken. *See St. Francis S. & L. Ass'n*, 221 N.W.2d at 843. Plaintiffs have not done so.

For these reasons, the Tiger Center does not have a breach of contract claim against Marquette, and this Cause of Action should be dismissed.

### B. Dr. Tiger does not have a claim for breach of contract premised on his faculty appointment.

In Count III (*i.e.*, Dr. Tiger's First Cause of Action), Dr. Tiger brings a claim for breach of contract against Marquette premised on his employment agreement. Am. Compl. ¶ 158; Ex. B. He alleges Marquette breached this agreement by:

> allowing Dean Bostic to implement sanctions against Dr. Tiger and take sanctions that were in violation of the employment contract and Marquette policies and procedures, including but not limited to, forcing Dr. Tiger to resign as Director of the Behavior Analysis Program at Marquette without process, taking disciplinary action against Dr. Tiger without following proper protocol, prohibiting students from receiving practicum supervision and sending a survey to each graduate student who were concurrently serving as witnesses in the Title IX investigation, not abiding by the grievance procedures outlined in the Marquette Handbook for Full-Time Faculty, and sharing the findings of the "safety" investigation with other students and/or professors.

HB: 4881-6047-8106.7

*Id.* at ¶ 159. Although Dr. Tiger dislikes each of these actions, there is, again, no connection between the purported contract(s) and the alleged breaches. Dr. Tiger cannot point to any contractual term that makes the promises he asserts.

As a preliminary matter, it is unclear whether Dr. Tiger's breach of contract claim is premised on only the Appointment/Contract Agreement (Exhibit B), or also on the Offer Letter (Exhibit A). Again, the Offer Letter is an *offer,* not a contract. Moreover, neither the Appointment/Contract Agreement or Offer Letter that Dr. Tiger attaches to the Amended Complaint were in effect in the summer and fall of 2022 when the alleged breaches occurred. By its terms, the Appointment/Contract Agreement—which served as the formalization of the offer made in the Offer Letter— was for the 2018-2019 school year. In any event, even setting aside Dr. Tiger's technical pleading failures, these contract claims fail on the merits.

Indeed, even if these exhibits constitute contracts in effect at the relevant time, neither the Offer Letter nor the Appointment/Contract Agreement discuss employment sanctions, the protocol for those sanctions, or concerns about student safety, much less discuss Title IX. *See* Ex. A, Ex. B. Instead, these purported contracts discuss Dr. Tiger's salary, his teaching obligations, and funding requirements. *Id*. Again, Plaintiffs have failed to connect any alleged contractual term with the alleged breach.

And to the extent that Dr. Tiger is claiming that Marquette did not comply with other Marquette policies, his failure to plead a specific contractual promise (or any policy term) is fatal. *See St. Francis S. & L. Ass'n*, 221 N.W.2d at 843. To be sure,

HB: 4881-6047-8106.7

both the Offer Letter and the Appointment/Contract Agreement contain promises that *Dr. Tiger* will abide by Marquette policies, including those in the Faculty Handbook. Dr. Tiger fails to identify a single policy or provision he believes was violated. He has not attached, quoted, or otherwise described any specific policy language about grievance procedures, or otherwise. A vague allegation that Marquette failed to comply with grievance procedures does not create an actionable breach of contract claim. *See St. Francis S. & L. Ass'n*, 221 N.W.2d at 843.

Dr. Tiger's silence on this point is most telling at this point in the litigation. Indeed, Marquette moved to dismiss his original complaint on the specific basis that he failed to identify an enforceable contract or actionable contractual term. Instead of responding to that motion, Dr. Tiger chose to amend, fully aware and on notice that he needed to identify the specific contractual terms allegedly breached. And, once again, he cannot do so. The absence of any such term is fatal.

Dr. Tiger's frustration with the University's decisions cannot create contractual obligations where none exist. To the extent the Offer Letter or Appointment/Contract Agreement at Exhibits A and B (which are the only two purported contracts entered into between Dr. Tiger and Marquette) are even enforceable contracts governing the relevant time period (which they are not), Dr. Tiger fails to identify any actionable contractual term that Marquette allegedly breached. This Court should dismiss Count III.

HB: 4881-6047-8106.7

**C. There is no implied contract between any Plaintiff and Marquette.**

Finally, in the Amended Complaint, it appears that Plaintiffs are attempting (albeit, unsuccessfully) to assert claims for beach of express contract, not any implied contract theory. But, out of an abundance of caution, to the extent Plaintiffs attempt to argue that their contract claims should be saved by some sort of "implied contract" theory, their allegations fall woefully short. To begin, implied in-law contract under Wisconsin law is based upon a theory of unjust enrichment. *Reetz v. Advoc. Aurora Health, Inc.*, 983 N.W.2d 669, 683 (Wis. Ct. App. 2022). Here, such a theory does not align with Plaintiffs' allegations, as Marquette was in no way conferred any sort of a benefit. To the contrary, Plaintiffs' own allegations concede that their services have ceased (or at least slowed).

Moreover, no matter the theory advanced, with ***any contract***, be it express or implied, "there must be an offer, acceptance, and consideration." *Linman v. Marten Transp., Ltd.*, No. 22-CV-204-JDP, 2023 WL 2562712, at *5 (W.D. Wis. Mar. 17, 2023) (citing *Goossen v. Estate of Standaert*, 525 N.W.2d 314 (Wis. Ct. App. 1994)). Plaintiffs must therefore plead specific conduct of the parties that shows a "mutual intention to contract" with respect to the specific terms alleged. *Id.* (citation omitted). Here, Plaintiffs have alleged no facts whatsoever about what the supposed terms of the "contract" even are, much less how Marquette supposedly assented to those terms. Without those allegations, any implied contract allegation (had Plaintiffs decided to include it) would fail as a matter of law.

HB: 4881-6047-8106.7

## II.    The Tiger Center Fails to State a Claim for Tortious Interference.

In Count II, the Tiger Center purports to assert a tortious interference claim. Marquette moved to dismiss this claim in the original complaint, arguing that Plaintiffs did not plead that Marquette intended to interfere with the Tiger Center's contracts with its patients, actually interfered with those contracts, was lawfully prohibited from engaging in the conduct, or otherwise committed some independently tortious act. Dkt. 8 at 11-15. Rather than clarifying this claim, however, it has only become less clear on what grounds this claim is stated. Plaintiffs' theory of tortious interference still stretches the cause of action way beyond its bounds, and this claim should be dismissed.

The Tiger Center (again) alleges that it "had valid and enforceable contracts [and prospective contracts] with third parties" to provide therapy to "children with intellectual and developmental disabilities." Am. Compl. ¶ 146. Plaintiffs have now *also* added an allegation that the "Tiger Center employed practicum trainees and others, independent of any Marquette involvement." *Id.* at ¶ 147. New to the Amended Complaint is the inclusion of the "Practicum Supervision Agreements" between unidentified practicum students and the Tiger Center. Ex. D; *see also* Am. Compl. ¶ 30. It's unclear, then, whether the contract with which Marquette is alleged to have tortiously interfered is between the Tiger Center and its patients *or* the contract between the Tiger Center and its practicum trainees (or both). [12] Regardless, these theories fail to state a claim as a matter of law.

---

[12] Additionally, *what* the interference is remains unclear. Plaintiffs continue to obfuscate the action taken by Marquette towards the Tiger Center. *See* note 7, *supra*. As acknowledged at least once,

HB: 4881-6047-8106.7

To plead a claim for tortious interference with a contract, the plaintiff "must allege that (1) an actual or prospective contract existed between [the plaintiff] and [a third party]; (2) [the defendant] interfered with that contract or prospective contract; (3) the interference was intentional; (4) the interference caused [the plaintiff] to sustain damages; and (5) [the defendant] was not justified or privileged to interfere." *See Quarra Stone Co., LLC. v. Yale Univ.*, No. 13-CV-790-SLC, 2014 WL 3120995, at *3 (W.D. Wis. July 8, 2014) (granting motion to dismiss tortious interference claim); *see also Wausau Med. Ctr., S.C. v. Asplund*, 514 N.W.2d 34, 44 (Wis. Ct. App. 1994).

Here, the Tiger Center fails to plead several essential elements of this claim. The most critical, and where the Court should turn for purposes of this motion, is the intent element. "To recover for interference with contract under Wisconsin law, it is essential that the defendant act intentionally." *Korea Advanced Inst. Of Sci. & Tech. v. Kip Co.*, No. 22-CV-317, 2022 WL 6193347, at *12 (E.D. Wis. Oct. 7, 2022) (quoting *Gruen Indus., Inc. v. Biller*, 608 F.2d 274, 282 (7th Cir. 1979)). "To have the requisite intent, the defendant must act ***with a purpose to interfere with the contract***." *Id.* (quoting *Gruen*, 608 F.2d at 282) (emphasis added)). "Interference may be found only

---

Marquette suspended, for a term of two years, the practicum program at the Tiger Center. Am. Compl. ¶¶ 132-133; *see also id.* at ¶ 124. In Count II, Plaintiffs allege (without further support) that the Tiger Center was "constructively evicted," that its employees were "essentially fired," and that patients were "abruptly preclude[ed] . . . from receiving care," as well as that students are unable to "receiv[e] practicum learning experience." *Id.* at ¶ 150; *see also id.* at ¶ 124 (students "remain prohibited from seeking practicum training at the Tiger Center."). But other than this entirely conclusory allegation, the Amended Complaint provides no allegations of fact regarding this "constructive eviction," the "constructive termination" of employees, or the interference with the relationship between the Tiger Center and its patients—and indeed, the other allegations in the Amended Complaint do not support such an inference. Plaintiffs acknowledge that the Behavioral Analysis Certification Board declined to enact any sanctions against Dr. Tiger, and he therefore remains a licensed, practicing BCBA. *See id.* at ¶ 132. The Tiger Center itself was not closed by Marquette, nor could it be, as it is an independently owned and operated LLC. *See id.* at ¶¶ 1, 11-14.

HB: 4881-6047-8106.7

where it is apparent *at the outset* that the alleged tortfeasor acted with the intention to interfere with the [prospective contract] or acted in such a fashion and for such a purpose that he knew that the interference was certain, or substantially certain, to occur." *Id.* (quotations omitted) (emphasis original) (citing *Foseid v. St. Bank of Cross Plains*, 541 N.W.2d 203, 210 n.11 (Wis. Ct. App. 1995)).

Here, the Tiger Center alleges "Defendants intentionally interfered with and deprived The Tiger Center of the means of performance. This caused nonperformance of third-party contracts with patients and providers." Am. Compl. ¶ 151. But this conclusory allegation of intent is not sufficient to plead that Marquette acted with the purpose of impacting the contracts between the Tiger Center and its patients or the Tiger Center and its students. *See Korea Advanced Inst. of Sci. & Tech.*, 2022 WL 6193347, at *12. There are no factual allegations in the Amended Complaint regarding intent—to the contrary, the pleadings make clear that as an independent entity, the Tiger Center retained the full ability to continue to treat patients, as it always remained an independent LLC "solely owned and operated by Dr. Tiger." Ex. A.; *id.* ("the Tiger Center shall at all times remain only under the sole ownership of Dr[.] Tiger"). And Plaintiffs' Amended Complaint confirms that Marquette took the actions it did in response to complaints it received. Am. Compl. ¶ 62. Plaintiffs do not plead, in any way, that Marquette intended to interfere in any contractual relationship.

Further, even if this Court moves past intent and looks at the alleged "conduct" itself, the Tiger Center also fails to sufficiently plead any "interference." There are no

HB: 4881-6047-8106.7

allegations that Marquette "took any actions to influence" the Tiger Center's patients with respect to their course of treatment or working with Dr. Tiger. *See, e.g.*, *Berman v. N. Custom Roofing, Inc.* No. 2021AP598, 2022 WL 363872, at *7 (Wis. Ct. App. Feb. 8, 2022). And although *Berman* was decided at summary judgment, the pertinent and dispositive point here is that the Tiger Center does not even include any *allegations* to show such improper influence. Rather, Marquette took action only with respect to *its own students*. Dr. Tiger is the one who, exclusively, maintained contact with his patients, a fact supported by Exhibit A, which clearly states that Marquette has no "interest in or right to any [...] operation [...] of the Tiger Center." Ex. A.

Plaintiffs' additional allegation in the amended Count II that the "Tiger Center employed practicum trainees" does not save this claim. Am. Compl. ¶ 147. Although the practicum was suspended for a two-year period, there was not a contract between the Tiger Center and those students with which Marquette interfered without authority to do so. To be clear, Marquette is the degree-granting institution; Marquette controls the provision of credits to students; and Marquette has responsibility to ensure its students can learn in safe environments.

Accordingly, Plaintiffs' allegation that there is a relationship with the Tiger Center and its practicum students "independent of any Marquette involvement," *see id.*, is entirely discredited by the other allegations of fact and the exhibits themselves. *See Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007) ("Where an exhibit and the complaint conflict, the exhibit typically controls").

HB: 4881-6047-8106.7

To begin, it is unclear that the "Practicum Supervision Agreements" even constitute contracts in the first place. For example, there does not appear to have been any consideration exchanged between *the Tiger Center* and the practicum students—the students obtained course credits **from Marquette** for participating in the practicum, and **Marquette** employed Dr. Tiger. *See e.g., Giddings v. Principal Fin. Grp., Inc.*, No. 07-CV-370, 2009 WL 742681, at *3 (E.D. Wis. Mar. 18, 2009) ("Under Wisconsin law '[a] valid contract requires an offer, acceptance, and consideration.'"). Even if they were contracts, the only reason the relationship between the Tiger Center and the practicum students exists is because of Marquette, which cannot tortiously interfere with an agreement to which it is a vital party. *See Joseph P. Caulfield & Assocs., Inc. v. Litho Prods., Inc.*, 155 F.3d 883, 889 (7th Cir. 1998) ("a party cannot interfere tortiously with its own contract"). Here, the fact that Dr. Tiger had students sign an agreement outlining how he would supervise them during a practicum does not create an actionable claim for anyone—much less **for him**—when Marquette temporarily suspended practicums there due to his misconduct.

Additionally, even if this Court were to find that Plaintiffs sufficiently alleged that Marquette interfered with contracts with either the Tiger Center's patients or the students engaged in practicum training there, Plaintiffs do not allege facts to show that Marquette was lawfully prohibited from engaging in this alleged interference. "Interference alone [] does not establish the tort" of tortious interference with contract; "in addition, the interference must be improper." *Briesemeister v.*

HB: 4881-6047-8106.7

*Lehner*, 720 N.W.2d 531, 543 (Wis. Ct. App. 2006). Courts should consider "all the circumstances" to determine whether an interference was improper, including "the nature, type, duration and timing of the conduct, whether the interference is driven by an improper motive or self-interest, and whether the conduct, even though intentional, was fair and reasonable under the circumstances." *Id*.

Plaintiffs' vague allegation that the suspension of the practicum program occurred "without good cause," *see* Am. Compl. ¶ 150, is not sufficient to show impropriety. Here, students obtaining practicum credits are Marquette's students; they are not the Tiger Center's or Dr. Tiger's students. Marquette has the prerogative—indeed, the obligation—to ensure that ***its*** students are educated in safe and supportive environments. *See, e.g., Bd. of Regents UW Sys. v. Decker*, 850 N.W.2d 112, 123 (Wis. 2014) (in which the Wisconsin Supreme Court stated, "university officials have a responsibility to ensure the health and safety of students."). And it most certainly has the discretion and ability to act when it learns of situations posing a risk to its students. Marquette is aware of no authority permitting an individual professor to infringe upon that privilege through an independent tort action, and this Court should not endorse such an approach.[13] In short, if Marquette discontinued its relationship with the Tiger Center for precisely the reasons alleged, it has done nothing improper or actionable with regard to any defined or undefined agreement.

---

[13] Indeed, Marquette made this very same point in its motion to dismiss the original complaint, *see* Dkt. 1, Ex. A at ¶ 75, and in their Amended Complaint, Plaintiffs have failed to provide any authority or new factual allegations to counter this argument.

26

Plaintiffs' new addition to Count II that Defendants "interfered with contracts" between the Tiger Center and Marquette students who were "employed by the Tiger Center outside of any class or practicum placement" does not change this analysis in any way. *See* Am. Compl. ¶ 150. To be clear, once again, the Tiger Center is a separate legal entity, and it is responsible for its own employment decisions. Marquette cannot control who the Tiger Center hires, nor can Marquette prevent the Tiger Center from hiring. In any event, Plaintiffs have failed to adequately allege that any employment outside of a class or practicum existed; the exhibits to the Amended Complaint only show that students engaged with the Tiger Center through the practicum program, *see* Ex. D, or through a graduate assistantship through Marquette, *see* Ex. C. Moreover, Plaintiffs themselves acknowledge that there was an assessment of the Tiger Center which included a survey, and that those survey results resulted in other "professors and/or students fil[ing] anonymous complaints" with various state and licensing agencies. Am. Compl. ¶ 126. Thus, even if there were students employed at the Tiger Center independent of Marquette, Plaintiffs do not allege that Marquette somehow forced that employment to cease, as opposed to a voluntary choice by the employee.

Due to Plaintiffs' multiple failures to sufficiently plead a claim for tortious interference, this Court should dismiss Count II with prejudice.

## III. Dr. Tiger Fails to State a Claim for Title IX Retaliation

Finally, Dr. Tiger's Title IX retaliation claim (Count IV) should be dismissed for a very simple reason: Dr. Tiger fails to allege he engaged in any protected activity.

HB: 4881-6047-8106.7

In order to state "a Title IX retaliation claim [a plaintiff] must show: (1) he engaged in protected activity under Title IX, (2) [the University] took a materially adverse action against him, and (3) there was a but-for causal connection between the two." *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 857 (7th Cir. 2019). Although Dr. Tiger fails to meet each of these elements, for purposes of this motion, it is dispositive that his status as a respondent in the Title IX proceeding is not protected activity for purposes of the private right of action under Title IX as a matter of law.

In *Jackson v. Birmingham Board of Education*, the Supreme Court held that Title IX prohibited retaliation because when "the complainant speaks out about sex discrimination, the 'on the basis of sex' requirement is satisfied." 544 U.S. 167, 179 (2005). The Court reiterated several times throughout its opinion that Title IX prohibited retaliation "against individuals because they complain of sex discrimination," solidifying the rule that "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Id.* at 174, 168 (emphasis original).

Here, Dr. Tiger alleges that he took part in protected activity under Title IX when he participated in the Title IX investigation ***as a respondent***, i.e., as the person accused of sexual harassment. Am. Compl. ¶¶ 47-51. However, participating in a Title IX investigation as a respondent is unrelated to sex, and therefore fails to satisfy the requirement for a Title IX retaliation claim, within the private right of action allowed under Title IX. *See Jackson*, 544 U.S. at 179; *see also Du Bois v. Bd. of*

HB: 4881-6047-8106.7

*Regents of Univ. of Minn.*, 987 F.3d 1199, 1205 (8th Cir. 2021). The Eighth Circuit said this plainly in *Du Bois*, stating: "No part of Title IX designates participation in a sexual harassment investigation on the side of the accused as protected activity" for the purposes of a Title IX retaliation claim. *See Du Bois*, 987 F.3d at 1205; *see also Pease v. Whitewater Unified Sch. Dist.*, No. 20-CV-103, 2022 WL 1598378, at *2 (E.D. Wis. May 20, 2022) (explaining that Plaintiff failed to prevail on a Title IX retaliation claim because he did not have a reasonable belief "that he was opposing an unlawful practice.").

The Eighth Circuit's articulation is simply an application of the Supreme Court's decision in *Jackson*, and this Court should apply that same reasoning here. Because Plaintiff fails to identify any protected action in which he engaged, his Title IX retaliation claim fails as a matter of law.

## CONCLUSION

Defendant Marquette University respectfully requests that this Court enter an order dismissing all claims in the Amended Complaint against it with prejudice and granting such other relief as the Court deems just and proper.

HB: 4881-6047-8106.7

Dated: January 16, 2024                    Respectfully,

/s/  Anthony J. Anzelmo

MICHAEL T. RAUPP
Husch Blackwell LLP
4801 Main Street , Suite 1000
Kansas City, Missouri 64112
(816) 983-8000 (tel.)
(816) 983-8080 (fax)
Michael.raupp@hushblackwell.com

ANTHONY ANZELMO
Husch Blackwell LLP
511 N Broadway, Suite 1100
Milwaukee, WI 53202
(414) 273-2100 (tel.)
(414) 223-5000 (fax)
Anthony.anzelmo@huschblackwell.com

MARY E. DEWEESE
KATHERINE M. TIERNEY
Husch Blackwell LLP
120 S. Riverside Plaza, Suite 2200
Chicago, IL 60606
(312) 655-1500 (tel)
(312) 655-1501 (fax)
Mary.deweese@huschblackwell.com
Katherine.tierney@huschblackwell.com

*Attorneys for Defendant*
*Marquette University*

30

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send electronic notification to all registered counsel of record this 16th day of January, 2024:


/s/ Anthony J. Anzelmo

*Attorney for Defendant*
*Marquette University*